U.S. DISTRICT COURT
N.D. OF N.Y.
FILED

AUG 2 5 2010

LAWRENCE K. BAERMAN, CLERK
ALBANY

1  Enid Futterman
2  661 Route 23
3  Craryville  NY  12521

4                  UNITED STATES DISTRICT COURT
5                  NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **Enid Futterman** | Case # ~~1 1 0~~ -~~CV~~- ~~1 0 0~~ 2 |
| Plaintiff, | |
| vs. | AMMENDED ORIGINAL  **LEK / DRH** |
| **Washington  Mutual  Bank,  FA  D/B/A** | PETITION |
| **CHASE** | |
| Defendant | |

6

7                                      Date: _____

8   ** notice to the court: only change is the defendants name to reflect Washington Mutual Bank,
9   to now reflect Washington Mutual Bank D/B/A Chase

10  Comes now Enid Futterman , hereinafter referred to as "Petitioner," and moves the court for
11  relief as herein requested:

12                                    **PARTIES**
13  Petitioner is  Enid  Futterman ,  661  Route 23  Craryville   NY  12521.   Currently  Known
14  Defendant(s) are/is: Washington Mutual Bank D/B/A Chase, 270 Park Ave, New York, NY
15  10017

16                                **STATEMENT OF CAUSE**
17  Petitioner, entered into a consumer contract for the refinance of a primary residence located at
18  661 Route 23  Craryville  NY 12521, hereinafter referred to as the "property."

19  Defendants, acting in concert and collusion with others, induced Petitioner to enter into a
20  predatory loan agreement with Defendant.

21  Defendants committed numerous acts of fraud against Petitioner in furtherance of a carefully
22  crafted scheme intended to defraud Petitioner.

ORIGINAL PETITION                                          1 of 24

23    Defendants failed to make proper notices to Petitioner that would have given Petitioner warning
24    of the types of tactics used by Defendants to defraud Petitioner.

25    Defendants charged false fees to Petitioner at settlement.

26    Defendants used the above referenced false fees to compensate agents of Petitioner in order to
27    induce said agents to breach their fiduciary duty to Petitioner.

28    Defendant's attorney caused to be initiated collection procedures, knowing said collection
29    procedures in the instant action were frivolous as lender is estopped from collection procedures,
30    under authority of Uniform Commercial Code 3-501, subsequent to the request by Petitioner for
31    the production of the original promissory note alleged to create a debt.

32                                              **IN BRIEF**
33                                    *(Non-factual Statement of Posture and Position)*

34     It is not the intent of Petitioner to indict the entire industry.  It is just that Plaintiff will be
35    making a number of allegations that, outside the context of the current condition of the real
36    estate industry, may seem somewhat outrageous and counter-intuitive.

37    When Petitioner accuses ordinary individuals of acting in concert and collusion with an
38    ongoing criminal conspiracy, it tends to trigger an incredulous response as it is
39    unreasonable to consider that all Agents, loan agents, appraisers, and other ordinary
40    people, just doing what they have been trained to do, are out to swindle the poor
41    unsuspecting borrower.

42    The facts Petitioner is prepared to prove are that Petitioner has been harmed by fraud
43    committed by people acting in concert and collusion, one with the other.  Petitioner has no
44    reason to believe that the Agent, loan officer, appraiser, and others were consciously aware
45    that what they were doing was part of an ongoing criminal conspiracy, only that it was,
46    and they, at the very least, kept themselves negligently uninformed of the wrongs they
47    were perpetrating.  Petitioner maintains the real culprit is the system itself, including the
48    courts, for failure to strictly enforce the consumer protection laws.

49                          **CAREFULLY CRAFTED CRIMINAL CONNIVANCE**
50                                    *(General State of the Real Estate Industry)*

51   ***THE BEST OF INTENTIONS***

52   Prior to the 1980's and 1990's ample government protections were in place to protect

53   consumers and the lending industry from precisely the disaster we now experience.

54   During President Clinton's administration, under the guise of making housing available to

55   the poor, primary protections were relaxed which had the effect of releasing the

56   unscrupulous on the unwary.

57   Prior to deregulation in the 1980's, lenders created loans for which they held and assumed

58   the risk.  Consequently, Americans were engaged in safe and stable home mortgages.

59   With the protections removed, the unscrupulous lenders swooped in and, instead of

60   making loans available to the poor, used the opportunity to convince the unsophisticated

61   American public to do something that had been traditionally taboo; home buyers were

62   convinced to speculate with their homes, their most important investment.

63   Washington Mutual Bank, D/B/A/ CHASE , Ameriquest, Countrywide, and many others

64   swooped in and convinced Americans to sell their homes, get out of their safe mortgage

65   agreements, and speculate with the equity they had gained by purchasing homes they could

66   not afford.  Lenders created loans intended to fail as, under the newly crafted system, the

67   Lender profited more from a mortgage default than from a stable loan.

68   Companies cropped up who called themselves banks when, in fact, they were only either

69   subsidiaries of banks, or unaffiliated companies that were operated for the purpose of

70   creating and selling promissory notes.  As will be demonstrated, these companies then

71   profited from the failure of the underlying loans.

72   ***HOW IT WORKS***

73   Briefly, how it works is this, the Lender would secure a large loan from a large bank,

74   convert that loan into 20 and 30 year mortgages and then sell the promise to pay to an

75   investor.

76   People would set up mortgage companies buy securing a large loan from one of the major

77   banks, then convert that loan into 20 and 30 year mortgages.  In order to accomplish this

78   an Agent would contract with a seller to find a buyer, bring both seller and buyer to a

79   lender who would secure the title from the seller using the borrowed bank funds for that

80   purpose, and then trade the title to the buyer in exchange for a promissory note.

81    The lender then creates a 20 or 30 year mortgage with money the lender must repay within

82    6 months.   As soon as the closing is consummated, the promissory note is sold to an

83    investor pool.

84    Using the instant case as an example, a 665,000.00 note at 5.0970% interest over 30 years

85    will produce $478,498.98  The lender can then offer to the investor the security instrument

86    (promissory note) at say 50% of it's future value.  The investor will, over the life of the

87    note, less approximately 3.00% servicing fees, realize $639,791.85 .  The lender can then

88    pay back the bank and retain a handsome profit in the amount of $14,366.61.  The lender,

89    however, is not done with the deal.

90    The lender signed over the promissory note to the investor at the time of the trade, but did

91    not sign over the lien document (mortgage or deed of trust).  The State of Kansas Supreme

92    Court addressed this issue and stated that such a transaction was certainly legal.  However,

93    it created a fatal flaw as the holder of the lien document, at time of sale of the security

94    instrument, received consideration in excess of the lien amount.   Since the lien holder

95    received consideration, he could not be harmed.     Therefore the lien became an

96    unenforceable document.

97    This begs the question: if keeping the lien would render it void, why would the lender not

98    simply transfer the lien with the promissory note?  The reason is because the lender will

99    hold the lien for three years, file an Internal Revenue Service Form 1099a, claim the full

100   amount of the lien as abandoned funds, and deduct the full amount from the lender's tax

101   liability.  The lender, by this maneuver, gets consideration a second time.  And still the

102   lender is not done profiting from the deal.

103   After sale of the promissory note, the lender remains as the servicer for the investor.  The

104   lender will receive 3% of each payment the lender collects and renders to the investor

105   pool.  However, if the payment is late, the lender is allowed to assess an extra 5% and keep

106   that amount.  Also, if the loan defaults, the lender stands to gain thousands for handling the

107   foreclosure.

108   The lender stands to profit more from a note that is overly expensive, than from a good

109   stable loan.   And where, you may ask, does all this profit come from?  It comes from the

110   equity the borrower had built up in the home.  And still the lender is not finished profiting

111   from the deal.

ORIGINAL PETITION                                                                          4 of 24

112   Another nail was driven in the American financial coffin when on the last day Congress
113   was in session in 2000 when restrictions that had been in place since the economic
114   collapse of 1907 were removed.  Until 1907  investors were allowed to bet on stocks
115   without actually buying them.  This unbridled speculation led directly to an economic
116   collapse.  As a result the legislature banned the practice, until the year 2000.  In 2000 the
117   unscrupulous lenders got their way on the last day of the congressional session.  Congress
118   removed  the restriction banning derivatives and again allowed the practice, this time
119   taking only 8 years to crash the stock market.   This practice allowed the lender to profit
120   further from the loan by betting on the failure of the security instrument he had just sold to
121   the unwary investor, thus furthering the purpose of the lender to profit from both the
122   borrower (consumer) and the investor.

123   The failure of so many loans recently resulted in a seven hundred and fifty billion dollar
124   bailout at the expense of the taxpayer.   The unsuspecting consumer was lulled into
125   accepting the pronouncements of the lenders, appraisers, underwriters, and trustees as all
126   were acting under the guise of government regulation and, therefore, the borrower had
127   reason to expect good and fair dealings from all.  Unfortunately, the regulations in place to
128   protect the consumer from just this kind of abuse were simply being ignored.

129   The loan origination fee from the HUD1 settlement statement is the finder's fee paid for
130   the referral of the client to the lender by a person acting as an agent for the borrower.
131   Hereinafter, the person or entity who receives any portion of the yield spread premium, or
132   a commission of any kind consequent to securing the loan agreement through from the
133   borrower will be referred to as "Agent."  The fee, authorized by the consumer protection
134   law is restricted to 1% of the principal of the note.  It was intended that the Agent, when
135   seeking out a lender for the borrower, would seek the best deal for his client rather than
136   who would pay him the most.  That was the intent, but not the reality.  The reality is that
137   Agents never come away from the table with less than 2% or 3% of the principal.  This is
138   accomplished by undisclosed fees to the Agent in order to induce the Agent to breach his
139   fiduciary duty to the borrower and convince the borrower to accept a more expensive loan
140   product than the borrower qualifies for.  This will generate more profits for the lender and,
141   consequently, for the Agent.

142   It is a common practice for lenders to coerce appraisers to give a higher appraisal than is
143   the fair market price.  This allows the lender to increase the cost of the loan product and
144   give the impression that the borrower is justified in making the purchase.

ORIGINAL PETITION                                                    5 of 24

145   The lender then charges the borrower an underwriting fee in order to convince the
146   borrower that someone with knowledge has gone over the conditions of the note and
147   certified that they meet all legal criteria.  The trustee, at closing, participates actively in the
148   deception of the borrower by placing undue stress on the borrower to sign the large stack
149   of paperwork without reading it.  The trustee is, after all, to be trusted and has been paid to
150   insure the transaction.  This trust is systematically violated for the purpose of taking unfair
151   advantage of the borrower.   The entire loan process is a carefully crafted contrive
152   connivance designed and intended to induce the unsophisticated borrower into accepting a
153   loan product that is beyond the borrowers means to repay.  With all this, it should be a
154   surprise to no one that this country is having a real estate crisis.

155                    **PETITIONER WILL PROVE THE FOLLOWING**
156   Petitioner is prepared to prove, by a preponderance of evidence that:

157   •   Lender has no legal standing to bring collection or foreclosure claims against the
158        property;

159   •   Lender is not a real party in interest in any contract which can claim a collateral
160        interest in the property;

161   •   even if Lender were to prove up a contract to which Lender had standing to enforce
162        against Petitioner, no valid lien exists which would give Lender a claim against the
163        property;

164   •   even if Lender were to prove up a contract to which Lender had standing to enforce
165        against Petitioner,  said contract was fraudulent in its creation as endorsement was
166        secured by acts of negligence, common law fraud, fraud by non-disclosure, fraud in
167        the inducement, fraud in the execution, usury, and breaches of contractual and
168        fiduciary obligations by Mortgagee or "Trustee" on the Deed of Trust, "Mortgage
169        Agents," "Loan Originators," "Loan Seller," "Mortgage Aggregator," "Trustee of
170        Pooled Assets," "Trustee or officers of Structured Investment Vehicle,"
171        "Investment Banker," "Trustee of Special Purpose Vehicle/Issuer of Certificates of
172        'Asset-Backed Certificates,'" "Seller of 'Asset-Backed' Certificates (shares or
173        bonds)," "Special Servicer" and Trustee, respectively, of certain mortgage loans
174        pooled together in a trust fund;

175     •    Defendants have concocted a carefully crafted connivance wherein Lender
176          conspired with Agents, et al, to strip Petitioner of Petitioner's equity in the property
177          by inducing Plaintiff to enter into a predatory loan inflated loan product;

178     •    Lender received unjust enrichment in the amount of 5% of each payment made late
179          to Lender while Lender and Lender's assigns acted as servicer of the note;

180     •    Lender and Lender's assigns, who acted as servicer in place of Lender, profited by
181          handling the foreclosure process on a contract Lender designed to have a high
182          probability of default;

183     •    Lender intended to defraud Investor by converting the promissory note into a
184          security instrument and selling same to Investor;

185     •    Lender intended to defraud Investor and the taxpayers of the United States by
186          withholding the lien document from the sale of the promissory note in order that
187          Lender could then hold the lien for three years, then prepare and file Internal
188          Revenue Form 1099a and falsely claim the full lien amount as abandoned funds
189          and deduct same from Lender's income tax obligation;

190     •    Lender defrauded backers of derivatives by betting on the failure of the promissory
191          note the lender designed to default;

192     •    participant Defendants, et al, in the securitization scheme described herein have
193          devised business plans to reap millions of dollars in profits at the expense of
194          Petitioner and others similarly situated.

195                              **PETITIONER SEEKS REMEDY**
196 In addition to seeking compensatory, consequential and other damages, Petitioner seeks
197 declaratory relief as to what (if any) party, entity or individual or group thereof is the
198 owner of the promissory note executed at the time of the loan closing, and whether the
199 Deed of Trust (Mortgage) secures any obligation of the Petitioner, and a Mandatory
200 Injunction requiring re-conveyance of the subject property to the Petitioner or, in the
201 alternative a Final Judgment granting Petitioner Quiet Title in the subject property.

202    ***PETITIONER HAS BEEN HARMED***

203 Petitioner has suffered significant harm and detriment as a result of the actions of Defendants.

204    Such harm and detriment includes economic and non-economic damages, and injuries to
205    Petitioner's mental and emotional health and strength, all to be shown according to proof at trial.

206    In addition, Petitioner will suffer grievous and irreparable further harm and detriment unless the
207    equitable relief requested herein is granted.

208    **STATEMENT OF CLAIM**

209    ***DEFENDANTS LACK STANDING***

210    **No evidence of Contractual Obligation**

211    Defendants claim a controversy based on a contractual violation by Petitioner but have failed to
212    produce said contract.  Even if Defendants produced evidence of the existence of said contract in
213    the form of an allegedly accurate photocopy of said document, a copy is only hearsay evidence
214    that a contract actually existed at one point in time.  A copy, considering the present state of
215    technology, could be easily altered.  As Lender only created one original and that original was
216    left in the custody of Lender, it was imperative that Lender protect said instrument.

217    In as much as the Lender is required to present the original on demand of Petitioner, there can be
218    no presumption of regularity when the original is not so produced.   In as much as Lender has
219    refused Petitioner's request of the chain of custody of the security instrument in question by
220    refusing to identify all current and past real parties in interest, there is no way to follow said
221    chain of custody to insure, by verified testimony, that no alterations to the original provisions in
222    the contract have been made.   Therefore, the alleged copy of the original is only hearsay
223    evidence that an original document at one time existed.  Petitioner maintains that, absent
224    production of admissible evidence of a contractual obligation on the part of Petitioner,
225    Defendants are without standing to invoke the subject matter jurisdiction of the court.

226    **No Proper Evidence of Agency**

227    Defendants claim agency to represent the principal in a contractual agreement involving
228    Petitioner, however, Defendants have failed to provide any evidence of said agency other than a
229    pronouncement that agency has been assigned by some person, the true identity and capacity of
230    whom has not been established.  Defendants can hardly claim to be agents of a principal then
231    refuse to identify said principal. All claims of agency are made from the mouth of the agent with
232    no attempt to provide admissible evidence from the principal.

233  Absent proof of agency, Defendants lack standing to invoke the subject matter jurisdiction of the
234  court.

235  **Special Purpose Vehicle**

236  Since the entity now claiming agency to represent the holder of the security instrument is not the
237  original lender, Petitioner has reason to believe that the promissory note, upon consummation of
238  the contract, was converted to a security and sold into a special purpose vehicle and now resides
239  in a Real Estate Mortgage Investment Conduit (REMIC)    as defined by the Internal Revenue
240  Code and as such, cannot be removed from the REMIC as such would be a prohibited
241  transaction.   If the mortgage was part of a special purpose vehicle and was removed on
242  consideration of foreclosure, the real party in interest would necessarily be the trustee of the
243  special purpose vehicle.  Nothing in the pleadings of Defendants indicates the existence of a
244  special purpose vehicle, and the lack of a proper chain of custody documentation gives Petitioner
245  cause to believe defendant is not the proper agent of the real party in interest.

246  *CRIMINAL CONSPIRACY AND THEFT*

247  Defendants, by and through Defendant's Agents, conspired with other Defendants, et al, toward
248  a criminal conspiracy to defraud Petitioner.  Said conspiracy but are not limited to acts of
249  negligence, breach of fiduciary duty, common law fraud, fraud by non-disclosure, and tortuous
250  acts of conspiracy and theft, to include but not limited to, the assessment of improper fees to
251  Petitioner by Lender, which were then used to fund the improper payment of commission fees to
252  Agent in order to induce Agent to violate Agent's fiduciary duty to Petitioner.

253  *AGENT PRACTICED UP-SELLING*

254  By and through the above alleged conspiracy, Agent practiced up-selling to Petitioner.  In so
255  doing, Agent violated the trust relationship actively cultivated by Agent and supported by fact
256  that Agent was licensed by the state.  Agent further defrauded Petitioner by failing to disclose
257  Agent's conspiratorial relationship to Lender,   Agent violated Agent's fiduciary duty to
258  Petitioner and the duty to provide fair and honest services, through a series of carefully crafted
259  connivances, wherein Agent proactively made knowingly false and misleading statements of
260  alleged fact to Petitioner, and by giving partial disclosure of facts intended to directly mislead
261  Petitioner for the purpose of inducing Petitioner to make decisions concerning the acceptance of
262  a loan product offered by the Lender.  Said loan product was more expensive than Petitioner

ORIGINAL PETITION                                                                          9 of 24

263  could legally afford. Agent acted with full knowledge that Petitioner would have made a
264  different decision had Agent given complete disclosure.

265  ### *FRAUDULENT INDUCEMENT*

266  Lender maliciously induced Petitioner to accept a loan product, Lender knew, or should have
267  known, Petitioner could not afford in order to unjustly enrich Lender.

268  ### *EXTRA PROFIT ON SALE OF PREDATORY LOAN PRODUCT*

269  Said more expensive loan product was calculated to produce a higher return when sold as a
270  security to an investor who was already waiting to purchase the loan as soon as it could be
271  consummated.

272  ### Extra Commission for Late Payments

273  Lender acted with deliberate malice in order to induce Petitioner to enter into a loan agreement
274  that Lender intended Petitioner would have difficulty paying.  The industry standard payment to
275  the servicer for servicing a mortgage note is 3% of the amount collected.  However, if the
276  borrower is late on payments, a 5% late fee is added and this fee is retained by the servicer.
277  Thereby, the Lender stands to receive more than double the regular commission on collections if
278  the borrower pays late.

279  ### Extra Income for Handling Foreclosure

280  Lender acted with deliberate malice in order to induce petitioner to enter into a loan agreement
281  on which Lender intended petitioner to default.  In case of default, the Lender, acting as servicer,
282  receives considerable funds for handling and executing the foreclosure process.

283  ### Credit Default Swap Gambling

284  Lender, after deliberately creating a loan intended to default is now in a position to bet on credit
285  default swap, commonly referred to as a derivative as addressed more fully below.  Since Lender
286  designed the loan to fail, betting on said failure is essentially a sure thing.

287  ### *LENDER ATTEMPTING TO FRAUDULENTLY COLLECT ON VOID LIEN*

288  Lender sold the security instrument after closing and received consideration in an amount in
289  excess of the lien held by Lender.  Since Lender retained the lien document upon the sale of the

ORIGINAL PETITION                                                    10 of 24

290   security instrument, Lender separated the lien from said security instrument, creating a fatal and
291   irreparable flaw.

292   When Lender received consideration while still holding the lien and said consideration was in
293   excess of the amount of the lien, Lender was in a position such that he could not be harmed and
294   could not gain standing to enforce the lien.  The lien was, thereby, rendered void.

295   Since the separation of the lien from the security instrument creates such a considerable concern,
296   said separation certainly begs a question: "Why would the Lender retain the lien when selling the
297   security instrument?"

298   When you follow the money the answer is clear.  The Lender will hold the lien for three years,
299   then file an IRS Form 1099a and claim the full amount of the lien as abandoned funds and deduct
300   the full amount from Lender's tax liability, thereby, receiving consideration a second time.

301   Later, in the expected eventuality of default by petitioner, Lender then claimed to transfer the
302   lien to the holder of the security, however, the lien once satisfied, does not gain authority just
303   because the holder, after receiving consideration, decides to transfer it to someone else.

304   ### LENDER PROFIT BY CREDIT DEFAULT SWAP DERIVATIVES

305   Lender further stood to profit by credit default swaps in the derivatives market, by way of inside
306   information that Lender had as a result of creating the faulty loans sure to default.  Lender was
307   then free to invest on the bet that said loan would default and stood to receive unjust enrichment
308   a third time.  This credit default swap derivative market scheme is almost totally responsible for
309   the stock market disaster we now experience as it was responsible for the stock market crash in
310   1907.

311   ### LENDER CHARGED FALSE FEES

312   Lender charged fees to Petitioner that were in violation of the limitations imposed by the Real
313   Estate Settlement Procedures Act as said fees were simply contrived and not paid to a third party
314   vendor.

315   Lender charged other fees that were a normal part of doing business and should have been
316   included in the finance charge.

ORIGINAL PETITION

317   Below is a listing of the fees charged at settlement.  Neither at settlement, nor at any other time

318   did Lender or Trustee provide documentation to show that the fees herein listed were valid,

319   necessary, reasonable, and proper to charge Petitioner.

| | | |
|---|---|---:|
| 808 | Application Fee | $495.00 |
| 809 | Processing Fee | $595.00 |
| 810 | Tax procurement tracking Fee | $50.00 |
| 811 | Tax Research payment service fee | $31.00 |
| 901 | Interest from 07/06/05  to08/01/05 @ /day $ 91.81 | $2,413.06 |
| 904 | School tax escrow Fee | $4,454.00 |
| 1101 | Settlement fee | $650.00 |
| 1108 | Title insurance fee | $3,515.00 |
| 1111 | Flood determination Fee | $13.00 |
| 1112 | Wire Transfer Fee | $35.00 |
| 1113 | Underwriting Fee | $405.00 |
| 1204 | Discharge Fee | $63.00 |
| 1303 | Courier Fee | 25.00 |
| 1304 | Title Close Fee | 350.00 |
| 1201 | Recording Fee | $97.00 |
| 1307 | Mortgage Tax | 1662.00 |
| 1202 | City/county tax/stamp | $6,650.00 |

320   Debtor is unable to determine whether or not the above fees are valid in accordance with the

321   restrictions provided by the various consumer protection laws.  Therefore, please provide; a

322   complete billing from each vendor who provided the above listed services; the complete contact

323   information for each vendor who provided a billed service; clearly stipulate as to the specific

324   service performed; a showing that said service was necessary; a showing that the cost of said

325   service is reasonable; a showing of why said service is not a regular cost of doing business that

326   should rightly be included in the finance charge.

327   The above charges are hereby disputed and deemed unreasonable until such time as said charges

328   have been demonstrated to be reasonable, necessary, and in accordance with the limitations and

329   restrictions included in any and all laws, rules, and regulations intended to protect the consumer.

330   In the event lender fails to properly document the above charges, borrower will consider same as

331   false charges.  The effect of the above amounts that borrower would pay over the life of the note

332   will be an overpayment of $175,659.48  This amount will be reduced by the amount of items

333   above when said items are fully documented.

334   ***RESPA PENALTY***

335   From a cursory examination of the records, with the few available, the apparent RESPA

336   violations are as follows: Good Faith Estimate not within limits, No HUD-1 Booklet, Truth In

337   Lending Statement not within limits compared to Note, Truth in Lending Statement not timely

ORIGINAL PETITION                                                    12 of 24

338  presented, HUD-1 not presented at least one day before closing, No Holder Rule Notice in Note,
339  No 1st Payment Letter.

340  The closing documents included no signed and dated : Financial Privacy Act Disclosure; Equal
341  Credit Reporting Act Disclosure; notice of right to receive appraisal report; servicing disclosure
342  statement; borrower's Certification of Authorization; notice of credit score; RESPA servicing
343  disclosure letter; loan discount fee disclosure; business insurance company arrangement
344  disclosure; notice of right to rescind.

345  The courts have held that the borrower does not have to show harm to claim a violation of the
346  Real Estate Settlement Procedures Act, as the Act was intended to insure strict compliance. And,
347  in as much as the courts are directed to assess a penalty of no less than two hundred dollars and
348  no more than two thousand, considering the large number enumerated here, it is reasonable to
349  consider that the court will assess the maximum amount for each violation.

350  Since the courts have held that the penalty for a violation of RESPA accrues at consummation of
351  the note, borrower has calculated that, the number of violations found in a cursory examination
352  of the note, if deducted from the principal, would result in an overpayment on the part of the
353  borrower, over the life of the note, of $209,909.90.

354  If the violation penalty amounts for each of the unsupported fees listed above are included, the
355  amount by which the borrower would be defrauded is $229,430.49

356  Adding in RESPA penalties for all the unsupported settlement fees along with the TILA/Note
357  variance, it appears that lender intended to defraud borrower in the amount of $776,349.71

358  ***LENDER CONSPIRED WITH APPRAISER***

359  Lender, in furtherance of the above referenced conspiracy, conspired with appraiser for the
360  purpose of preparing an appraisal with a falsely stated price, in violation of appraiser's fiduciary
361  duty to Petitioner and appraiser's duty to provide fair and honest services, for the purpose of
362  inducing Petitioner to enter into a loan product that was fraudulent toward the interests of
363  Petitioner.

364  ***LENDER CONSPIRED WITH TRUSTEE***

365  Lender conspired with the trust Agent at closing to create a condition of stress for the specific
366  purpose of inducing Petitioner to sign documents without allowing time for Petitioner to read and
367  fully understand what was being signed.

ORIGINAL PETITION                                                              13 of 24

368   The above referenced closing procedure was a carefully crafted connivance, designed and
369   intended to induce Petitioner, through shame and trickery, in violation of trustee's fiduciary duty
370   to Petitioner and the duty to provide fair and honest services, to sign documents that Petitioner
371   did not have opportunity to read and fully understand, thereby, denying Petitioner full disclosure
372   as required by various consumer protection statutes.

373   ### *DECEPTIVE ADVERTISING AND OTHER UNFAIR BUSINESS PRACTICES*

374   In the manner in which Defendants have carried on their business enterprises, they have engaged
375   in a variety of unfair and unlawful business practices prohibited by *15 USC Section 45* et seq.
376   (Deceptive Practices Act).

377   Such conduct comprises a pattern of business activity within the meaning of such statutes, and
378   has directly and proximately caused Petitioner to suffer economic and non-economic harm and
379   detriment in an amount to be shown according to proof at trial of this matter.

380   ### *EQUITABLE TOLLING FOR TILA AND RESPA*

381   The Limitations Period for Petitioners' Damages Claims under TILA and RESPA should be
382   Equitably Tolled due to the DEFENDANTS' Misrepresentations and Failure to Disclose.

383   Any claims for statutory and other money damages under the Truth in Lending Act *(15 U.S.C. §*
384   *1601,* et. seq.) and under the Real Estate Settlement Procedures Act *(12 U.S.C. § 2601* et. seq.)
385   are subject to a one-year limitations period; however, such claims are subject to the equitable
386   tolling doctrine. The Ninth Circuit has interpreted the TILA limitations period in § 1640(e) as
387   subject to equitable tolling. In *King v. California, 784 F.2d 910 (9th Cir.1986),* the court held
388   that given the remedial purpose of TILA, the limitations period should run from the date of
389   consummation of the transaction, but that "the doctrine of equitable tolling may, in appropriate
390   circumstances, suspend the limitations period until the borrower discovers or has reasonable
391   opportunity to discover the fraud or nondisclosures that form the basis of the TILA action." *King*
392   *v. California, 784 F.2d 910, 915 9t*h Cir. 1986).

393   Likewise, while the Ninth Circuit has not taken up the question whether *12 U.S.C. § 2614,* the
394   anti-kickback provision of **RESPA,** is subject to equitable tolling, other Courts have, and hold
395   that such limitations period may be equitably tolled. The Court of Appeals for the District of
396   Columbia held that § 2614 imposes a strictly jurisdictional limitation, *Hardin v. City Title &*

ORIGINAL PETITION                                                              14 of 24

397 *Escrow Co., 797 F.2d 1037, 1039-40 (D.C. Cir. 1986),* while the Seventh Circuit came to the
398 opposite conclusion. *Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1164 (7th*
399 *Cir. 1997).* District courts have largely come down on the side of the Seventh Circuit in holding
400 that the one-year limitations period in § 2614 is subject to equitable tolling. See, e.g., *Kerby v.*
401 *Mortgage Funding Corp., 992 F.Supp. 787, 791-98 (D.Md.1998); Moll v. U.S. Life Title Ins. Co.,*
402 *700 F.Supp. 1284, 1286-89 (S.D.N.Y.1988).* Importantly, the Ninth Circuit, as noted above, has
403 interpreted the TILA limitations period in *15 U.S.C. § 1640* as subject to equitable tolling; the
404 language of the two provisions is nearly identical. *King v. California, 784 F.2d at 914.* While not
405 of precedential value, this Court has previously found both the TILA and **RESPA** limitations
406 periods to be subject to equitable tolling. *Blaylock v. First American Title Ins. Co., 504*
407 *F.Supp.2d 1091,* (W.D. Wash. 2007). 1106-07.

408 The Ninth Circuit has explained that the doctrine of equitable tolling "focuses on excusable delay
409 by the Petitioner," and inquires whether "a reasonable Petitioner would ... have known of the
410 existence of a possible claim within the limitations period." *Johnson v. Henderson, 314 F.3d*
411 *409, 414 (9th Cir.2002), Santa Maria v. Pacific Bell, 202 F.3d 1170, 1178 (9th Cir.2000).*
412 Equitable tolling focuses on the reasonableness of the Petitioner's delay and does not depend on
413 any wrongful conduct by the Defendants. Santa Maria. at 1178.

414 ### *BUSINESS PRACTICES CONCERNING DISREGARDING OF UNDERWRITING*
415 ### *STANDARDS*

416 Traditionally, Lenders required borrowers seeking mortgage loans to document their income and
417 assets by, for example, providing W-2 statements, tax returns, bank statements, documents
418 evidencing title, employment information, and other information and documentation that could
419 be analyzed and investigated for its truthfulness, accuracy, and to determine the borrower's
420 ability to repay a particular loan over both the short and long term. Defendants deviated from and
421 disregarded these standards, particularly with regard to its riskier and more profitable loan
422 products.

423 ### Low-Documentation/No-Documentation Loans.

424 Driven by its desire for market share and a perceived need to maintain competitiveness with the
425 likes of Countrywide, Defendants began to introduce an ever increasing variety of low and no
426 documentation loan products, including the HARMs and HELOCs described hereinabove, and
427 began to deviate from and ease its underwriting criteria, and then to grant liberal exceptions to

428  the already eased underwriting standards to the point of disregarding such standards. This
429  quickened the loan origination process, allowing for the generation of more and more loans
430  which could then be resold and/or securitized in the secondary market.

431  Defendants marketed no-documentation/low-documentation loan programs that included
432  HARMs and HELOCs, among others, in which loans were given based on the borrower's "stated
433  income" or "stated assets" (SISA) neither of which were verified. Employment was verbally
434  confirmed, if at all, but not further investigated, and income, if it was even considered as a factor,
435  was to be roughly consistent with incomes in the types of jobs in which the borrower was
436  employed. When borrowers were requested to document their income, they were able to do so
437  through information that was less reliable than in a full-documentation loan.

438  For stated income loans, it became standard practice for loan processors, loan officers and
439  underwriters to rely on www.salary.com to see if a stated income was reasonable.  Such stated
440  income loans, emphasizing loan origination from a profitability standpoint at the expense of
441  determining the ability of the borrower to repay the loan from an underwriting standpoint,
442  encouraged the overstating and/or fabrication of income.

443  **Easing of Underwriting Standards**

444  In order to produce more loans that could be resold in the secondary mortgage market,
445  Defendants also relaxed, and often disregarded, traditional underwriting standards used to
446  separate acceptable from unacceptable risk. Examples of such relaxed standards were reducing
447  the base FICO score needed for a SISA loan.

448  Other underwriting standards that Defendants relaxed included qualifying interest rates (the rate
449  used to determine whether borrowers can afford the loan), loan to value ratios (the amount of
450  loan(s) compared to the appraised/sale price of the property, whichever is lower), and debt-to-
451  income ratios (the amount of monthly income compared to monthly debt service payments and
452  other monthly payment obligations.

453  With respect to HARMS, Defendants underwrote loans without regard to the borrower's long-
454  term financial circumstances, approving the loan based on the initial fixed rate without taking
455  into account whether the borrower could afford the substantially higher payment that would
456  inevitably be required during the remaining term of the loan.

457   With respect to HELOCs, Defendants underwrote and approved such loans based only on the
458   borrower's ability to afford the interest-only payment during the initial draw period of the loan,
459   rather than on the borrower's ability to afford the subsequent, fully amortized principal and
460   interest payments.

461   As Defendants pushed to expand market share, they eased other basic underwriting standards.
462   For example, higher loan-to-value (LTV) and combined loan-to-value (CLTV) ratios were
463   allowed. Likewise, higher debt-to-income (DTI) ratios were allowed. At the same time that they
464   eased underwriting standards the Defendants also were encouraging consumers to go further into
465   debt in order to supply the very lucrative aftermarket of mortgage backed securities.  The relaxed
466   underwriting standards created the aftermarket supply they needed. As a result, the Defendants
467   made it easy for the unwary consumer to take on more debt than he could afford by encouraging
468   unsound financial practices, all the while knowing defaults would occur more and more
469   frequently as the credit ratios of citizens reached the limit of the new relaxed underwriting
470   standards.

471   Defendants knew, or in the exercise of reasonable care should have known, from its own
472   underwriting guidelines industry standards that it was accumulating and selling/reselling risky
473   loans that were likely to end up in default. However, as the pressure mounted to increase market
474   share and originate more loans, Defendants began to grant "exceptions" even to its relaxed
475   underwriting guidelines. Such was the environment that loan officers and underwriters were,
476   from time to time, placed in the position of having to justify why they did not approve a loan that
477   failed to meet underwriting criteria.

478   **Risk Layering**

479   Defendants compromised its underwriting even further by risk layering, i.e. combining high risk
480   loans with one or more relaxed underwriting standards.

481   Defendants knew, or in the exercise of reasonable care should have known, that layered risk
482   would increase the likelihood of default. Among the risk layering Defendants engaged in were
483   approving HARM loans with little to no down payment, little to no documentation, and high
484   DTI/LTV/CLTV ratios. Despite such knowledge, Defendants combined these very risk factors in
485   the loans it promoted to borrowers.

ORIGINAL PETITION

486     Loan officers and mortgage Agents aided and abetted this scheme by working closely with other
487     mortgage Lenders/mortgage bankers to increase loan originations, knowing or having reason to
488     believe that Defendants and other mortgage Lenders/mortgage bankers with whom they did
489     business ignored basic established underwriting standards and acted to mislead the borrower, all
490     to the detriment of the borrower and the consumer of loan products..

491     Petitioner is informed and believe, and on that basis allege, that Defendants, and each of them,
492     engaged and/or actively participated in, authorized, ratified, or had knowledge of, all of the
493     business practices described above in paragraphs 30-42 of this Complaint

494     *UNJUST ENRICHMENT*

495     Petitioner is informed and believes that each and all of the Defendants received a benefit at
496     Petitioner's expense, including but not limited to the following: To the Agent, commissions,
497     yield spread premiums, spurious fees and charges, and other "back end" payments in amounts to
498     be proved at trial; To the originating Lender, commissions, incentive bonuses, resale premiums,
499     surcharges and other "back end" payments in amounts to be proved at trial; To the investors,
500     resale premiums, and high rates of return; To the servicers including EMS, servicing fees,
501     percentages of payment proceeds, charges, and other "back end" payments in amounts to be
502     proved at trial; To all participants, the expectation of future revenues from charges, penalties and
503     fees paid by Petitioner when the unaffordable LOAN was foreclosed or refinanced.

504     By their misrepresentations, omissions and other wrongful acts alleged heretofore, Defendants,
505     and each of them, were unjustly enriched at the expense of Petitioner, and Petitioner was unjustly
506     deprived, and is entitled to restitution in the amount of $776,349.71

507     *CLAIM TO QUIET TITLE.*

508     Petitioner properly averred a claim to quiet title. Petitioner included both the street address, and
509     the Assessor's Parcel Number for the property. Petitioner has set forth facts concerning the title
510     interests of the subject property. Moreover, as shown above, Petitioner's claims for rescission
511     and fraud are meritorious. As such, Petitioner's bases for quiet title are meritorious as well.

512     Defendants have no title, estate, lien, or interest in the Subject Property in that the purported
513     power of sale contained in the Deed of Trust is of no force or effect because Defendants' security
514     interest in the Subject Property has been rendered void and that the Defendants are not the holder

ORIGINAL PETITION                                         

515  in due course of the Promissory Note. Moreover, because Petitioner properly pled all Defendants'
516  involvement in a fraudulent scheme, all Defendants are liable for the acts of its co-conspirators,

517      "a Petitioner is entitled to damages from those Defendants who concur in the tortuous
518      scheme with knowledge of its unlawful purpose." *Wyatt v. Union Mortgage Co., 24 Cal.*
519      *3d 773, 157 Cal. Rptr. 392, 598 P.2d 45 (1979); Novartis Vaccines and Diagnostics, Inc.*
520      *v. Stop Huntingdon Animal Cruelty USA, Inc., 143 Cal. App. 4th 1284, 50 Cal. Rptr. 3d*
521      *27 (1st Dist. 2006); Kidron v. Movie Acquisition Corp., 40 Cal. App. 4th 1571, 47 Cal.*
522      *Rptr. 2d 752 (2d Dist. 1995).*

523      ### SUFFICIENCY OF PLEADING

524  Petitioner has sufficiently pled that relief can be granted on each and every one of the
525  Complaint's causes of action. A complaint should not be dismissed "unless it appears beyond
526  doubt that the Petitioner can prove no set of facts in support of Petitioner claim which would
527  entitle Petitioner to relief." *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* "All
528  allegations of material fact in the complaint are taken as true and construed in the light most
529  favorable to Petitioner." *Argabright v. United States, 35 F.3d 1476, 1479 (9th Cir. 1996).*

530  Attendant, the Complaint includes a "short, plain statement, of the basis for relief." Fed. Rule Civ. Proc.
531  8(a). The Complaint contains cognizable legal theories, sufficient facts to support cognizable legal
532  theories, and seeks remedies to which Petitioner is entitled. *Balistreri v. Pacifica Police Dept., 901 F.2d*
533  *696, 699 (9th Cir. 1988); King v. California, 784 F.2d 910, 913 (9th Cir. 1986).* Moreover, the legal
534  conclusions in the Complaint can and should be drawn from the facts alleged, and, in turn, the court
535  should accept them as such. *Clegg v. Cult Awareness Network, 18 F.3d 752* (9th Cir, 1994). Lastly,
536  Petitioner's complaint contains claims and has a probable validity of proving a "set of facts" in support of
537  their claim entitling them to relief. *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* Therefore,
538  relief as requested herein should be granted.

539                          ## CAUSES OF ACTION

540      ### BREACH OF FIDUCIARY DUTY

541  Defendants Agent, appraiser, trustee, Lender, et al, and each of them, owed Petitioner a fiduciary
542  duty of care with respect to the mortgage loan transactions and related title activities involving
543  the Trust Property.

ORIGINAL PETITION

544   Defendants breached their duties to Petitioner by, *inter alia,* the conduct described above. Such
545   breaches included, but were not limited to, ensuring their own and Petitioners' compliance with
546   all applicable laws governing the loan transactions in which they were involved, including but
547   not limited to, TILA, HOEPA, **RESPA** and the Regulations X and Z promulgated there under.

548   Defendant's breaches of said duties were a direct and proximate cause of economic and non-
549   economic harm and detriment to Petitioner(s).

550   Petitioner did suffer economic, non-economic harm, and detriment as a result of such conduct,
551   all to be shown according to proof at trial of this matter.

552   ***CAUSE OF ACTION - NEGLIGENCE/NEGLIGENCE PER SE***

553   Defendants owed a general duty of care with respect to Petitioners, particularly concerning their
554   duty to properly perform due diligence as to the loans and related transactional issues described
555   hereinabove.

556   In addition, Defendants owed a duty of care under TILA, HOEPA, **RESPA** and the Regulations
557   X and Z promulgated there under to, among other things, provide proper disclosures concerning
558   the terms and conditions of the loans they marketed, to refrain from marketing loans they knew
559   or should have known that borrowers could not afford or maintain, and to avoid paying undue
560   compensation such as "yield spread premiums" to mortgage Agents and loan officers.

561   Defendants knew or in the exercise of reasonable care should have known, that the loan
562   transactions involving Petitioner and other persons similarly situated were defective, unlawful,
563   violative of federal and state laws and regulations, and would subject Petitioner to economic and
564   non-economic harm and other detriment.

565   Petitioner is among the class of persons that TILA, HOEPA, **RESPA** and the Regulations X and
566   Z promulgated there under were intended and designed to protect, and the conduct alleged
567   against Defendants is the type of conduct and harm which the referenced statutes and regulations
568   were designed to deter.

569   As a direct and proximate result of Defendant's negligence, Petitioner suffered economic and
570   non-economic harm in an amount to be shown according to proof at trial.

ORIGINAL PETITION

571    *AGENT: COMMON LAW FRAUD*

572    If any Agents' misrepresentations made herein were not intentional, said misrepresentations were
573    negligent. When the Agents made the representations alleged herein, he/she/it had no reasonable
574    ground for believing them to be true.

575    Agents made these representations with the intention of inducing Petitioner to act in reliance on
576    these representations in the manner hereafter alleged, or with the expectation that Petitioner
577    would so act.

578    Petitioner is informed and believes that Agent et al, facilitated, aided and abetted various Agents
579    in their negligent misrepresentation, and that various Agents were negligent in not implementing
580    procedures such as underwriting standards oversight that would have prevented various Agents
581    from facilitating the irresponsible and wrongful misrepresentations of various Agents to
582    Defendants.

583    Petitioner is informed and believes that Agent acted in concert and collusion with others named
584    herein in promulgating false representations to cause Petitioner to enter into the LOAN without
585    knowledge or understanding of the terms thereof.

586    As a proximate result of the negligent misrepresentations of Agents as herein alleged, the
587    Petitioner sustained damages, including monetary loss, emotional distress, loss of credit, loss of
588    opportunities, attorney fees and costs, and other damages to be determined at trial. As a
589    proximate result of Agents' breach of duty and all other actions as alleged herein, Defendants has
590    suffered severe emotional distress, mental anguish, harm, humiliation, embarrassment, and
591    mental and physical pain and anguish, all to Petitioner's damage in an amount to be established
592    at trial.

593    *PETITIONER PROPERLY AVERRED A CLAIM FOR BREACH OF THE IMPLIED*
594    *COVENANT OF GOOD FAITH AND FAIR DEALING.*

595    Petitioner properly pled Defendants violated the breach of implied covenant of good faith and
596    fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its
597    performance and its enforcement." *Price v. Wells Fargo Bank, 213 Cal.App.3d 465, 478, 261*
598    *Cal. Rptr. 735 (1989);* Rest.2d Contracts § 205. A mortgage Agent has fiduciary duties. *Wyatt v.*

ORIGINAL PETITION                                                      21 of 24

599  *Union Mortgage Co., (1979) 24 Cal. 3d. 773.* Further, In *Jonathan Neil & Associates, Inc. v*
600  *Jones, (2004) 33 Cal. 4th 917,* the court stated:

601  In the area of insurance contracts the covenant of good faith and fair dealing has taken on a
602  particular significance, in part because of the special relationship between the insurer and the
603  insured. The insurer, when determining whether to settle a claim, must give at least as much
604  consideration to the welfare of its insured as it gives to its own interests. . . The standard is
605  premised on the insurer's obligation to protect the insured's interests . . . *Id. at 937.*

606  Likewise, there is a special relationship between an Agent and borrower. "A person who
607  provides Agency services to a borrower in a covered loan transaction by soliciting Lenders or
608  otherwise negotiating a consumer loan secured by real property, is the fiduciary of the
609  consumer...this fiduciary duty [is owed] to the consumer regardless of whom else the Agent may
610  be acting as an Agent for . . . The fiduciary duty of the Agent is to deal with the consumer in
611  *good faith.* If the *Agent knew or should have known that the Borrower will or has a likelihood of*
612  *defaulting ... they have a fiduciary duty to the borrower not* to place them in that loan."
613  (California Department of Real Estate, *Section 8: Fiduciary Responsibility,* www.dre.ca.gov).
614  [*Emphasis Added*].

615  All Defendants, willfully breached their implied covenant of good faith and fair dealing with
616  Petitioner when Defendants: (1) Failed to provide all of the proper disclosures; (2) Failed to
617  provide accurate Right to Cancel Notices; (3) Placed Petitioner into Petitioner's current loan
618  product without regard for other more affordable products; (4) Placed Petitioner into a loan
619  without following proper underwriting standards; (5) Failed to disclose to Petitioner that
620  Petitioner was going to default because of the loan being unaffordable; (6) Failed to perform
621  valid and /or properly documented substitutions and assignments so that Petitioner could
622  ascertain Petitioner rights and duties; and (7) Failed to respond in good faith to Petitioner's
623  request for documentation of the servicing of Petitioner's loan and the existence and content of
624  relevant documents. Additionally, Defendants breached their implied covenant of good faith and
625  fair dealing with Petitioner when Defendants initiated foreclosure proceedings even without the
626  right under an alleged power of sale because the purported assignment was not recorded and by
627  willfully and knowingly financially profiting from their malfeasance. Therefore, due to the
628  special relationship inherent in a real estate transaction between Agent and borrower, *and* all
629  Defendants' participation in the conspiracy, the Motion to Dismiss should be denied.

ORIGINAL PETITION

630    ***CAUSE OF ACTION VIOLATION OF TRUTH IN LENDING ACT 15 U.S.C. §1601 ET***
631    ***SEQ***

632    Petitioner hereby incorporates by reference, re-pleads and re-alleges each and every allegation
633    contained in all of the paragraphs of the General Allegations and Facts Common to All Causes of
634    Action as though the same were set forth herein.

635    Petitioner is informed and believes that Defendant's violation of the provisions of law rendered
636    the credit transaction null and void, invalidates Defendant's claimed interest in the Subject
637    Property, and entitles Petitioner to damages as proven at trial.

638    ***INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS***

639    The conduct committed by Defendants, driven as it was by profit at the expense of increasingly
640    highly leveraged and vulnerable consumers who placed their faith and trust in the superior
641    knowledge and position of Defendants, was extreme and outrageous and not to be tolerated by
642    civilized society.

643    Defendants either knew that their conduct would cause Petitioner to suffer severe emotional
644    distress, or acted in conscious and/or reckless disregard of the probability that such distress
645    would occur.

646    Petitioner did in fact suffer severe emotional distress as an actual and proximate result of the
647    conduct of Defendants as described hereinabove.

648    As a result of such severe emotional distress, Petitioner suffered economic and non economic
649    harm and detriment, all to be shown according to proof at trial of this matter.

650    Petitioner demands that Defendants provide Petitioner with release of lien on the lien signed by
651    Petitioner and secure to Petitioner quite title;

652    Petitioner demands Defendants disgorge themselves of all enrichment received from Petitioner
653    as payments to Defendants based on the fraudulently secured promissory note in an amount to be
654    calculated by Defendants and verified to Petitioner;

655    Petitioner further demands that Defendants pay to Petitioner an amount equal to treble the
656    amount Defendants intended to defraud Petitioner of which amount Petitioner calculated to be
657    equal to $2,329,049.13

ORIGINAL PETITION                                                                    23 of 24

658 **PRAYER**

659 WHEREFORE, Petitioner prays for judgment against the named Defendants, and each of them,

660 as follows:

661 For an emergency restraining order enjoining lender and any successor in interest from
662 foreclosing on Petitioner's Property pending adjudication of Petitioner's claims set forth
663 herein;

664 For a permanent injunction enjoining Defendants from engaging in the fraudulent,
665 deceptive, predatory and negligent acts and practices alleged herein;

666 For quiet title to Property;

667 For rescission of the loan contract and restitution by Defendants to Petitioner according
668 to proof at trial;

669 For disgorgement of all amounts wrongfully acquired by Defendants according to proof
670 at trial;

671 For actual monetary damages in the amount $776,349.71;

672 For pain and suffering due to extreme mental anguish in an amount to be determined at
673 trial.

674 For pre-judgment and post-judgment interest according to proof at trial;

675 For punitive damages according to proof at trial in an amount equal to $2,329,049.13.

676 For attorney's fees and costs as provided by statute; and,

677 For such other relief as the Court deems just and proper.

678 **Respectfully Submitted,**
679
680
681 **Enid Futterman**

ORIGINAL PETITION